## McCAULLEY v. CITY OF PHILADELPHIA.

### (Circuit Court of Appeals, Third Circuit. January 7, 1903.)

### No. 21.

**1. NAVIGABLE WATERS—OBSTRUCTIONS—NEGLIGENCE OF CITY.**

A city, although charged by statute with the duty of keeping the channels of navigable streams within its limits free from obstructions, cannot be held liable for an injury caused by a sunken wreck, where the owner had in due time undertaken its removal through the agency of a reputable and experienced wrecking company, which was proceeding with apparent diligence and good faith and by customary methods.

**2. SAME—JURISDICTION ASSUMED BY UNITED STATES.**

Where the war department of the United States has taken charge of the removal of a sunken wreck in a navigable stream under authority of an act of congress, its jurisdiction in the matter is exclusive, and a city cannot be held negligent in failing to take action for its removal.

**3. SAME—STATUTORY LIABILITY—CITY OF PHILADELPHIA.**

Act Pa. April 14, 1859 (P. L. 643), which places on the warden of the port of Philadelphia, who is a state officer, the duty of removing any vessel "sinking in the channel way of the tide waters of the river Delaware or the river Schuylkill within the limits of the port of Philadelphia," modified the general provisions of section 28 of the consolidation act of February 2, 1854 (P. L. 37), which imposed upon the city of Philadelphia the duty of keeping the navigable waters within the city open and free from obstructions, so far as related to sunken vessels of the character described.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For former opinions, see 103 Fed. 661, and 116 Fed. 438.

Horace L. Cheyney, for appellant.

Chester N. Farr, Jr., for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. In this suit the libelant (here the appellant) sought to recover from the city of Philadelphia damages which the ship Windsor Park sustained on December 29, 1893, while being towed up the Schuylkill river, by reason of the collision of the ship with the wreck of the steamer Maryland, which was lying in the river a short distance below Point Breeze, within the city. The action was based and pressed upon the provisions of section 28 of the act of assembly of February 2, 1854 (P. L. 37), commonly called the "Consolidation Act," which provides in part as follows:

"It shall be the duty of the said councils, after the requisite surveys and soundings shall have been made, to fix the lines beyond which no wharf or pier shall be constructed, and to keep the navigable waters within said city forever open and free from obstructions."

The libel set forth that the wreck of the Maryland had been lying in the river since November, 1892, and charged that the city of Philadelphia was negligent in not having removed the wreck from the river before the happening of the collision. The learned district judge, while assuming that section 28 of the consolidation act was applicable to this case (103 Fed. 661; 116 Fed. 438), yet upon the facts shown by the proofs found that the charge of negligence contained

in the libel against the city was not made out, and hence dismissed the libel.

It appears that in November, 1892, in a destructive fire which occurred at Point Breeze, the steamer Maryland took fire, and that she was towed down stream a short distance, and run ashore upon the east bank of the Schuylkill river, where she sank in such a position that 50 or 60 feet of her length projected into the channel of the river. Very soon thereafter the wreck was sold to a responsible purchaser, who immediately contracted with a competent and experienced contractor —the Mason Wrecking Company—to raise and remove the wreck. The wrecking company began work early in March, 1893, which the evidence satisfactorily shows was as soon as weather conditions permitted. The work seems to have been prosecuted very diligently and with reasonably proper machinery and appliances. At first considerable progress was made toward removing the obstruction, and success seemed to be assured. In his letter (in evidence) dated May 11, 1893, to the Atlantic Refining Company, in reply to its complaint that the wreck "has shifted," etc., Maj. C. W. Raymond, the head of the corps of United States engineers stationed at Philadelphia, wrote:

"I have had an investigation made of the wreck and its locality, and it appears that the owner of the wreck, Mr. Fred. Creamer, of Camden, N. J., has been at work for some time making efforts to raise it with pontoons, and had practically succeeded in beaching it, when the extra strain caused by the freshet of last week parted his hawsers and sling chains, which permitted the vessel to be carried a short distance toward the channel. I understand that Mr. Creamer is again at work readjusting his chains and preparing to raise and beach the vessel. If the obstruction is not out of the way within a reasonable time, authority will be requested to remove it under the provisions of the act of congress approved June 14, 1880."

The Mason Wrecking Company renewed and continued its efforts to remove and beach the wreck with at least some show of success, but about the last day of August the wreck again slid down into the channel. On September 13, 1893, Major Raymond, in a written report to the war department, recommended the removal of the wreck by the general government, pursuant to the act of congress of June 14, 1880. Accordingly, on September 18th he advertised for proposals, and on September 28, 1893, the notice required by the act of congress of the purpose of the secretary of war to remove the wreck was given. On October 30, 1893, the Mason Wrecking Company applied to Maj. Raymond for an allowance of 30 days' more time for the removal of the wreck by that company, and this extension of time was granted by the war department upon the recommendation of Maj. Raymond, who, in his letter to the department of October 30, 1893, stated: "A recent examination shows that the wreck is not now in the way of passing vessels." The wrecking company, however, failed to remove the wreck within the extended time, and on December 19, 1893, the United States government entered into a contract with other wreckers for its removal, work to commence on December 31, 1893, and to be finished on January 31, 1894.

We do not see that the learned district judge erred in his findings of fact, and, even upon the assumption that section 28 of the consolidation act is still in full force, we agree with his conclusion that the

proofs did not convict the city of negligence. The city was not bound to intervene after the owner of the wreck within due time had undertaken its removal through the agency of a reputable and experienced wrecking company, while that company was proceeding with apparent diligence and good faith and by a customary method.

It may be that the act of congress of June 14, 1880, which makes it the duty of the secretary of war to cause the removal of any sunken vessel or water craft which shall obstruct or endanger the navigation of any river or navigable water of the United States, does not wholly supersede the state law relative to the removal of sunken vessels lying in the waters of the rivers Delaware and Schuylkill within the port of Philadelphia. But the important fact here is that as early as the month of September, 1893, the war department of the United States had interposed under the act of congress and taken charge of the matter of the removal of the wreck of the steamer Maryland. The war department advertised for proposals, gave the required notice of the purpose of the secretary of war, granted to the Mason Wrecking Company an extension of 30 days, and at the expiration of this extension made a contract for the removal of the wreck. All this took place before this collision, and such was the situation on December 29, 1893, when the collision occurred. Now, it is clear, we think, that after the secretary of war had taken action, and while he was proceeding under the act of congress, the authorities of the city of Philadelphia were precluded from acting with respect to this wreck. The jurisdiction of the secretary of war, having actually attached, was necessarily exclusive.

Here we might well rest the case. Our attention, however, having been particularly directed to the Pennsylvania act of April 14, 1859 (P. L. 643), relative to the duties of the master warden of the port of Philadelphia with respect to sunken vessels, it seems proper to give this act consideration. The act provides that it shall be the duty of the master warden of the port of Philadelphia, upon the sinking of any canal boat, barge, or other vessel "in the channel way of the tide waters of the river Delaware or river Schuylkill within the limits of the port of Philadelphia," to give notice to the owner, master, or other agent having charge thereof to raise and remove such obstruction within 10 days, under a penalty of $100, and, in case of the refusal or neglect of the parties interested as aforesaid to raise and remove such obstruction, it shall be the further duty of said master warden to have it raised and removed at the expense of the owner, master, or agent, and he shall have a lien on the vessel and cargo for all expenses; and the subsequent act of May 20, 1864 (P. L. 906), authorizes the master warden to recover from the owner, master, or agent having control of said vessel, by a personal suit, the expenses of raising, removing, and selling the vessel, together with the penalty aforesaid and costs. The master warden of the port of Philadelphia is a state officer, appointed and commissioned by the governor. The act of 1859 distinctly imposes upon the master warden of the port of Philadelphia, a state, and not a city, official, the special duty of raising and removing vessels sinking "in the channel way of the tide waters of the river Delaware or river Schuylkill within the limits of the port of Philadelphia." This act does not repeal section 28 of the consolidation act, but we think

that it works a modification of the general language of that section to the extent of the particular duty thus imposed upon the master warden of the port. This construction harmonizes the two enactments. The specific duty of raising and removing vessels sinking "in the channel way of the tide waters" of the rivers within the port limits is put upon the master warden of the port, while the duty to keep the navigable waters open and free from all other obstructions remains upon the city. This was the construction given to the act of 1859 by the district court of Philadelphia in Winpenny v. City of Philadelphia, 7 Phila. 111. The opinion of Judge Thayer, enforcing this view, is very convincing. It is true that the judgment of nonsuit entered in that case was reversed by the supreme court of Pennsylvania. Winpenny v. City of Philadelphia, 65 Pa. 135. The reversal, however, was wholly upon the ground that the case before the court did not fall within the scope of the act of 1859. The obstruction which did the mischief there complained of was held not to be within the terms or the intent of that act. The obstruction was occasioned by an abandoned coal barge, which had been wrecked in the upper waters of the Schuylkill and brought down by a freshet and lodged within the port limits of the city of Philadelphia. The supreme court in its opinion said:

"It was not a trading vessel, or a boat, or barge, capable of use, but an old and worthless wreck, which had drifted off and lodged and became embedded in the mud. It did not sink, within the letter or the spirit of the act, in the tide water of the Schuylkill and the limits of the port of Philadelphia, but was brought down the river by a freshet. It had no owner, master, or agent having charge of it, but had been abandoned in the upper waters of the river."

We find nothing whatever in the opinion of the supreme court of Pennsylvania to indicate that that court disapproved of the construction which the district court of Philadelphia had given to the act of 1859.

Clearly the obstruction caused by the wreck of the steamer Maryland was one within the letter and the spirit of the act of 1859. The steamer sank in the channel way of the tide water of the river Schuylkill within the limits of the port of Philadelphia. The wreck was of considerable value and had a responsible owner, who had charge of it. We cannot doubt that, under the state law, the duty of having the wreck raised and removed was upon the master warden of the port, a state officer, and not upon the city of Philadelphia; and, if there was any neglect in respect to the wreck, it was the neglect of the master warden, for whose negligence the city is not answerable.

As well on the ground upon which the district judge placed his decision, as for the other reasons stated in this opinion, the decree of the court below is affirmed.