## THE MARY S. LEWIS.

(District Court, D. Connecticut. December 1, 1903.)

### Nos. 1,384, 1,385.

1. NAVIGABLE WATERS—INJURY OF VESSEL BY WRECK—FAILURE TO MARK POSITION OF SUNKEN VESSEL.

A loaded scow owned by libelants sank in the night, lying across the edge of the harbor channel as dredged, which was 20 feet deep, while the anchorage basin adjacent, 300 feet wide, was 16 feet deep. Libelants did not mark the position of the sunken vessel, except by an ordinary spar buoy, placed near its center, which was insufficient to give warning of the wreck. On the second morning thereafter the oyster steamer Lewis, coming in, ran into the sunken scow, both vessels being injured. *Held*, that libelants were in fault for failing to properly mark the place of the wreck, and that the steamer was not chargeable with contributory fault because she was on the left-hand side of the channel; her draft being such that she could navigate over any part of the anchorage basin, and was not confined to the channel.

2. COLLISION—DAMAGES RECOVERABLE.

A claim for the value of the oysters left on the bed, and not marketed, as claimed, by reason of the injury of an oyster boat in collision, is too speculative and remote for allowance as an element of damages for the collision.

In Admiralty. Libel and cross-libel for collision, and libel for salvage growing out of same collision.

A. McC. Mathewson and E. H. Rogers, for libelants.
Canfield & Judson, for claimant.

PLATT, District Judge. At and prior to the occurrence over which this contention arises, the Virginia Dredging Company had a contract for deepening and improving the harbor at New Haven. During Friday night, January 30, 1903, a loaded mud scow belonging to that company (original libelant herein) was sunk in the harbor. It had been moored alongside two light scows, and a steam tug lay near by. A strong gale blew from the northwest, throwing much water upon the deck of the scow. It was in commission and use, and seaworthy. It is probable that the hatches were not properly closed, and that the water cast upon the deck by the gale permeated through the openings into the compartments, and so, overcoming the buoyancy of the scow, forced it to the bottom of the harbor; but I do not care to rest the decision of the case upon that point alone. It sank on the western edge of the 20-foot channel, which had been widened 100 feet to the eastward by the contract work; thus making the channel 400 feet wide, although by the last published chart it appeared to be only 300 feet. To the west of the channel a 16-foot anchorage basin extended some 300 feet. These depths are those shown by the water at dead low tide. The mud scow was 132 feet

long, and lay, when sunk, with about one-half of its length extending into the 20-foot channel at an angle of about 45° toward the south. If it had extended directly into the channel, it would have pointed very nearly to the east. When the libelant heard of the disaster on Saturday morning, the 31st, it considered the wreck worth reclaiming; and, having first attempted to dump the mud from the pockets, which was found to be impossible, undertook to designate the position of the wreck by proper signals, which should warn mariners that a danger was there to be avoided. On Sunday, February 1st, at about 9:30 a. m., the steamer Mary S. Lewis, drawing about 9½ feet of water, coming up the harbor laden with oysters, struck the south-easterly end of the wreck, damaging its own hull, and also inflicting certain damages upon the sunken scow. For these damages, and for salvage services rendered on account of and in connection with the accident to the steamer, the libelant seeks recovery in these actions; and by cross-complaint in No. 1,384 the owners of the Lewis seek recovery for the damage sustained by the steamer. The cases have been elaborately tried, and exhaustive briefs have been submitted by counsel, covering all the contentions at issue.

Assuming, for the sake of the discussion, that the mud scow sank without fault of the libelants, we are confronted by two questions: (1) Was either party in fault for the damage? (2) If one party was in fault, did the other party so act as to contribute to the damage? Growing out of, and in connection with, these questions, is one vital, essential, and controlling inquiry, which, when answered, practically disposes of the serious contention, and this is the question: In the circumstances, was the place of the wreck properly marked or designated by warning buoys, beacons, or by any other means, so that mariners in the harbor should have been put on guard, and have had reason for avoiding the dangerous spot?

The libelant claims that on Saturday it caused a spar buoy, 30 feet long and 15 to 18 inches in diameter, to be anchored at about the middle of the wreck, and about 5 feet from the northerly side, and that by a gooseneck iron it hung a red lantern, which rose about 3 feet above the end of the buoy; that by this means the red lantern was some 8 or 10 feet above the surface of the water, and furnished a sufficient and constant warning to all navigators to avoid danger in that vicinity; that the warning beacon was there shortly before the accident and some time after the accident; and that it is reasonable to infer that it was there at the time of the accident. It is practically conceded by all parties that, if such a beacon was there at the time of the accident, it was a sufficient warning, and would relieve the libelant from the charge of negligence. The conflict centers around the question of fact as to whether it was or was not there at the time of the accident. If such warning beacon was placed there Saturday afternoon, and remained there until Monday, it is, to put it mildly, rather remarkable that so little direct testimony in support of that fact was produced by the libelant. In a case so thoroughly presented, the omission of certain bits of seemingly obtainable evidence becomes significant. It was a busy harbor, and there must have been much passing and repassing; and yet only two men swear

126 F.—54

to placing such a beacon there, and one other says that he saw it there. The two witnesses to the placing also fail to agree on some of the surrounding facts and circumstances. No evidence is produced to establish when and where the red lantern was obtained, and several other discrepancies and differences are patent. Placing the burden of proof wherever one chooses to place it, I am entirely satisfied from the testimony that no such warning beacon as has been described was on or about the place of the wreck at the time of the injury complained of. The situation itself tends to corroborate the contention that the red lantern was not in place, as described, at 9:30 Sunday morning. It was confessedly within the circle which the light scows would describe in swinging about upon their anchor chain. By the testimony, they were sometimes southerly of the wreck, and at other times on the northerly side; depending, of course, upon wind and tide. In swinging over a buoy so equipped, the destruction of the lantern would be well-nigh inevitable. To take such chances would seem to be nearly enough of itself to impute negligence to the libelant.

While putting in its case, the libelant called Capts. Brown and Tees. They both testified to anchoring the buoy Saturday afternoon, and to putting on, somewhat later, the red lantern, and lighting it. They also testified to lighting the lantern on the buoy again Sunday afternoon. The claimant introduced testimony to show that two men in a yawl boat were seen Sunday afternoon driving an iron gooseneck into the end of the buoy, and that one of them had a red lantern in his hand. In reply, the captains testified that they went down to the wreck Sunday afternoon on the Patton, and sent two men out in a yawl boat to refill and relight the lantern, and that the men took out the gooseneck iron from the end of the buoy into the yawl for that purpose. Why such pains were taken, if the apparatus had been on duty for 24 hours, is unexplained, and, I fear that I must add, unexplainable; and there was furthermore an ominous absence of the two men sent out in the yawl, although they were employés of the libelant at the time of the accident, and no reason was vouchsafed for the failure to produce them. The captains are also at sword's points as to the time when an attempt was made to anchor another buoy at the channel end of the wreck. One swears to Saturday; the other insists upon Sunday. There is also another mystery about the warning signal. Capt. Potter, of the Lewis, saw Capt. Tees down the harbor and near the wreck after the accident, and, when he asked him later what he was doing there, got the reply that he was fixing the buoys, to which Capt. Potter made a rather lurid reply, which, when interpreted, carries a suggestion that it was foolish to lock the stable door after the horse had been stolen. The Lewis came up the harbor at fair speed, with a clear view, and with ample lookout in the pilot house. A tug belonging to the libelant could have easily notified the steamer of the wreck, but failed to do so. When the officer of the tug was asked the reason for such failure, he replied that he understood that all the oyster boats had been notified. The parties on the lookout in the pilot house of the Lewis saw nothing to warn them of the wreck. They saw the two light scows, which had

drifted to the southerly so that they lay between the Lewis and the wreck, and headed for them. When quite close, the Lewis sheered off to the starboard, expecting to pass the light scows some 60 feet to the eastward. In so doing the hull just crossed the corner of the mud scow, as before set forth. The steamer was stopped at once, and at that very instant an ordinary spar buoy was seen at the place where the libelant claims to have placed the buoy, and to have equipped it with gooseneck and red lantern. This buoy was not of a nature to indicate danger, even if it had been seen sooner. It was quite similar to other buoys used by the dredging company for mooring buoys, and it was natural to assume that it was in use in connection with the light scows. There is evidence from several parties that it was seen at the time, and that it had no red lantern on it. Capt. Dow, the harbor inspector—an entirely disinterested witness—passed within 75 feet of the wreck on Monday at about 12 o'clock noon. This was evidently prior to the time when the libelant raised the wreck. That work began later, and continued for a considerable time; and it was in the later stages of those proceedings that the libelant, by the testimony of one witness, claims to have seen the lantern, his attention having been called to it by the fact that the cables interfered with it. Since Capt. Dow saw nothing of the work of raising, it is clear that his trip must have been earlier in the day. He states positively that he saw the buoy as he passed by, and that there was no lantern upon it. He also states that it gave him no impression that danger lay hidden there, and only looked as if it were intended for use in connection with the light scows. At that time, too, the witness knew about the collision, but was unaware of the exact location of the wreck, although he must have known that it could not have been far from the light scows. It is also clear that the captain had passed the location of the wreck once, at least, after the time when the libelant insists that the red lantern was put in place, although at perhaps 500 or more feet distance; and it is very unlikely that so noticeable a feature in the view as a red lantern could have escaped his attention, and yet he saw nothing of the kind. Capt. Brown, of the oyster boat Isaac Brown, was also down by and close to the light scows Monday forenoon, and he did not see a lantern. Samuel E. Smith, the government inspector employed by the New Haven Towing Company, an experienced navigator, saw the buoy in question before and after the collision, and to him it gave no warning of danger. He heard of the collision, and yet the buoy did not impress him after that.

A red lantern on a spar buoy 8 or 10 feet above the surface of the water is a sight too unusual to be so easily overlooked. If the fact were otherwise, it could hardly be claimed that it would be a sufficient warning of hidden peril. It is not reasonable to suppose that the buoy seen by the witnesses on the Lewis at the time of the accident was the mooring buoy used for the light scows. Some of them locate the buoy too accurately to permit that inference, and it is of exceeding importance that no one noticed any other buoy in that immediate vicinity, and that no one saw so unusual a thing as a red lantern on any buoy at or about that time. It is probable that a red

lantern was put on the buoy Sunday afternoon for the first time. It is possible that it was put on Saturday, and swept off by the light scows. It is not unlikely that the function of the lantern, in the libelant's mind, was to furnish a "beacon by night," trusting the spar above to act as a "warning by day." If this be so, the conflicting testimony can be better understood than from any other hypothesis.

I find from all the circumstances of the case that there was no lantern on the buoy at or about the time of the accident. It is conceded by the libelant that an ordinary spar buoy, minus a red lantern, at the place where it is claimed the buoy was sunk, would not have been sufficient warning of the hidden peril. The damage is therefore clearly due to the negligence of the libelant.

The other question is, was the claimant also guilty of negligence which contributed to the loss? The libelant thinks that it was, and for two reasons:

First. For steaming up the harbor recklessly and with undue haste, because it was late in landing its oysters. This condition I do not find to be sustained by the facts.

Second. For hugging the larboard side of the 20-foot channel, which act is claimed to have been in violation of article 25 of the navigation rules [page 2883, U. S. Comp. St. 1901], which reads as follows:

"In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel."

The Lewis only drew 9½ feet of water, and the anchorage basin, so-called, was 16 feet in depth at the lowest tide. It is clear that, when not meeting or avoiding vessels, the entire stretch of harbor was at its disposal. A tug and tow had just gone up, at the suggestion of the libelant's agent, on the west of the light scows. The Lewis had been holding its course some of the time on, and at other times off, the 20-foot channel. There was no obligation upon it to pay attention to whether the water beneath it was 20 feet deep or 16 feet deep. In no view of the case can I deem the claimant to have been negligent in this respect.

The libelant having been found to be in fault in the collision case, the claim for salvage has no foundation to rest upon.

It follows that the claimant, under his cross-complaint, is entitled to such damages as he has shown to have resulted from the collision. Evidence was taken in this regard, and it is unnecessary to refer the matter to a commissioner. I find that the claimant is entitled to recover from the libelant for the following items of damage:

1. Cost of repairs ................................................ $101 70
2. Time of Lewis and wages of crew, 6 days, at $45................. 270 00
3. Time of Florence consorting Lewis to home port for repairs, and delivering the oysters at Fair Haven, 2 days.................. 80 00
4. Extra service in expediting the unloading of the Lewis.......... 7 40

The item for loss of value of oysters left on the bed and undelivered that season by reason of the injury to the Lewis, $910, I cannot allow. It is too speculative and remote. It was not impossible to have marketed the oysters that season notwithstanding the dis-

aster. If actual depreciation existed at the time of the hearing, some demonstration thereof might have been adduced. I appreciate the contention that, since the libelant has been found to be in fault, it is not within its province to be hypercritical, but to assess him this element of damage does not accord with my sense of the absolute impartiality which should prevail in all admiralty causes.

Let a decree be entered in favor of the claimant against the Virginia Dredging Company for damages as computed and costs in the collision case, and for costs in the salvage case.