PEOPLE'S COAL CO. v. SECOND POOL COAL CO.

(District Court, W. D. Pennsylvania. September 8, 1910.)

No. 3.

1. NAVIGABLE WATERS (§ 24*)—OBSTRUCTION BY WRECK—LIABILITY OF OWNER FOR FAILURE TO MARK WRECK—ABANDONMENT.

Under Act March 3, 1899, c. 425, §§ 15, 19, 30 Stat. 1152, 1154 (U. S. Comp. St. 1901, pp. 3543, 3546), which provide that whenever any vessel or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and maintain such marks until it is removed or abandoned, and to at once commence the removal of the same, and that if not removed within 30 days, or if sooner abandoned, it may be broken up or removed by the Secretary of War, the neglect to mark a sunken craft as required is not a prima facie abandonment, nor is the failure to remove it an abandonment until the expiration of 30 days, and during all of such time it is the duty of the owner to keep the place marked, and if he does not he is liable for injuries caused to others thereby, unless there has been an actual abandonment.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 66; Dec. Dig. § 24.*]

2. NAVIGABLE WATERS (§ 24*) — OBSTRUCTION BY WRECK — LIABILITY FOR INJURY CAUSED TO OTHER VESSELS—"OWNER."

Respondent, a coal company, having in its possession as bailee a coal flat partly loaded with coal, moored to its float in the Allegheny river in Pittsburg, cast it loose during a flood, and it sank some distance below. The place was not marked, and some three weeks later libelant's vessel ran into it and was injured. Held, that respondent was the "owner," within the meaning of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), and required by such act to mark the place until the flat was removed or abandoned, and, it appearing that there had been no abandonment, that respondent was liable to libelant for the injury to its vessel.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 66; Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 6, pp. 5134–5151; vol. 8, p. 7744].

In Admiralty. Suit by the People's Coal Company against the Second Pool Coal Company. Decree for libelant.

John G. Frazer and John J. Heard, for libelant.

L. C. Barton, for respondent.

ORR, District Judge. This is a libel in personam to recover damages for injuries to a steamboat, owned by the libelant, as a result of a collision with a sunken flat in the channel of the Allegheny river at Pittsburg. It appears that on March 15, 1907, a flatboat owned by the Diamond Coal Company and marked "Diamond Coal Company No. 33," being then partially loaded with coal and moored to a float of the respondent in the river at the foot of Thirty-First street, was permitted by the respondent to become separated from the float and to be carried by the current to a point near the foot of Twenty-Fifth street, where it sank in the channel of the river. There was at the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

time very high water in the river, and great quantities of ice and other drift. Because of the action of such drift upon that flat and other flats attached to said float, it was deemed proper, in order to save the float, to cut the said flat loose and push it into the stream. On the 4th of April following, in broad daylight, the steamship W. C. Jutte, owned by the libelant, being then fully manned and in good repair and order, was proceeding down the river without a tow, when she ran upon the sunken flat and was so badly damaged by the force of the collision that she sank. No buoy or other thing had been placed over the sunken flat prior to this time to indicate the location of the obstruction, which was known to the respondent, but not to libelant. There was some evidence offered tending to show a swirl in the water immediately over the flat, such as would be caused by a sunken obstruction, and there was some evidence that there were many swirls in the water in the vicinity of this place, due to holes left by sand diggers or dredgers. After a careful consideration of the testimony, I am unable to find that there was anything above the surface of the water to give notice of the sunken flat. ·

A great deal of testimony was taken as to whether or not there was negligence on the part of respondent in cutting said flat from its moorings. Considering the condition of the river, and considering the obstructions upon the shore against which the float of respondent had been forced by the high water, I am of the opinion that there was no such want of care on the part of respondent as would make it liable by reason of the mere fact of cutting the flat adrift. Had abandonment (to be hereafter considered) taken place, at the time of cutting the flat adrift, the respondent might not have been liable to the libelant in this proceeding. The respondent insisted that there could be no responsibility upon it, for the reason, among others, that the respondent was not the "owner" of the sunken flat. The evidence shows that the respondent owns no boats or flats, but is in the coal business, buying coal from others, who deliver the flats, loaded with coal, to the respondent at its float, where the flats are unloaded by the respondent. When the flats are unloaded, they are removed from respondent's landing by the owners. The flat Diamond Coal Co. No. 33 had not been unloaded at the time it was cut loose, and could not then have been taken by the owner. It was in the hands of respondent as bailee. While not having the absolute, it had a qualified, property. It was a quasi owner. As such bailee the respondent was responsible to third persons for injury done by the flat. To hold otherwise would be contrary to principle.

Section 15 of the act of March 3, 1899 (30 Stat. 1152, c. 425 [U. S. Comp. St. 1901, p. 3543]), provides:

"That it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft, or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or, to float loose timber and logs, or to float what is known as sack rafts of timber and logs in streams or channels actually navigated by steamboats in such manner as to obstruct, impede or endanger navigation. And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately

mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for."

Section 16 provides penalties for the violation of the provisions of the act.

"Sec. 19. That whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction, shall be subject to be broken up, removed, sold or otherwise disposed of by the Secretary of War at his discretion, without liability for any damage to the owners of the same: Provided, That in his discretion, the Secretary of War may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To whom it may concern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof," etc.

It seems clear that within the meaning of this act the respondent is to be regarded as the owner of the flat and to be subject to the liabilities expressed or implied by the act for failure to buoy the sunken flat. The act itself is criminal in its nature, and imposes penalties for its violation, and does not create by its terms a liability to a party who may be injured by the violation of the statutory duty. It is true that at law, where a duty is imposed by statute, a remedy for a private wrong is not to be read into the statute, unless the duty may have existed at common law. This is not so in admiralty. There are a number of cases which hold that actual violation of a statutory rule imposes the burden upon the violating vessel to show, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Steamship Pennsylvania v. Troop, 19 Wall. 125, 22 L. Ed. 148; Taylor v. Harwood, Fed. Cas. No. 13,794. Prior to the act of Congress it was the duty of the owner of a sunken craft to put a buoy or light on it until it was abandoned. See Harwood v. Pearson, 1 Campbell, 515; White v. Crisp, 26 English L. E. 532; The Snark, 82 Law Times Reporter (N. S.) 42; B. & H. S. Co. v. The Norman C. Munson, 117 Mass. 34. There were many cases cited by the respondent in support of the proposition that the owner of a vessel which has been sunk in navigable waters is under no obligations to remove the vessel, or to answer for injuries caused thereby. But all these cases qualify the proposition, either expressly or impliedly, by the proviso that the vessel be "abandoned by the owner." A leading case cited by the respondent was Winpenny v. Philadelphia, 65 Pa. 135. In this case abandonment is emphasized by the following quotation from Shearman & Redfield on the Law of Negligence, § 583:

"If, however, instead of abandoning such wreck, he retains such possession and control of it as it is susceptible of, he is bound to exercise an ordinary

and reasonable degree of diligence in removing it or preventing its doing injury to others."

It was urged on behalf of respondent that, because respondent had neglected its duty to mark the place of the sunken vessel and to immediately commence the removal of the same from the river's channel, that of itself constituted an abandonment, and therefore there is no responsibility. To hold this would permit the respondent to take advantage of its own wrong. The neglect to mark the sunken craft was no prima facie abandonment, and failure to remove was not abandonment until a period of 30 days had elapsed, or the Secretary of War had established the legal abandonment of the vessel within the statutory period. There is no evidence in this case that the Secretary of War had taken any steps to declare the abandonment of the vessel within 30 days, and therefore the respondent had all of 30 days to remove same before the sunken craft could be considered as having been abandoned. This seems to me to be a reasonable construction of the language of the act. In addition to this, the evidence fails to show that there was any abandonment of the vessel by the respondent. No notice of abandonment was given to the Secretary of War. Abandonment was not set up in the answer, which on the contrary, suggests retention of ownership, as appears by the following excerpt:

"When respondent was informed that said flatboat was sunken in said river, it at once took all possible steps to designate its presence by a buoy and have said obstruction removed, although it knew only by report that said obstruction was its flatboat. That it was impossible to remove said obstruction or designate its presence on account of said flood and high water, and that respondent used every effort so to do."

No person connected with the respondent in any way testified to the intention of abandoning the flat. On the contrary, while the river was still high, the superintendent of the respondent negotiated with a man named Jackson to place a buoy over the flat. Two days after the W. C. Jutte struck the sunken flat a buoy was placed over the flat by two men, one of whom had assisted in cutting the flat loose from respondent's float. The coal was taken out by some person or corporation designated by one of respondent's witnesses as "Iron City Hoist." Another witness, Gumbert, testified that Jackson raised the boat for him (Gumbert). When Jackson was on the stand as a witness for the respondent, he was not asked to explain his connection with the removal of the sunken flat, or his relations to Gumbert. It is true Gumbert testified that he removed the sunken flat for his own account, and not for the account of the respondent, with the knowledge and consent of the United States engineers in charge of the river. But Gumbert was discredited. The records of the engineers show no authorization to Gumbert for the removal, and no report that the flat had been removed. Shortly after the flat had been removed, it was seen in an unused part of the Ohio river with the name "Diamond Coal Company No. 33" painted out. Still the name and number could be read underneath the white paint. No person connected with the "Iron City Hoist" was called by the respondent, nor was the absence of the men who had buoyed the flat accounted for.

I am satisfied from the evidence that the respondent had no in-

tention of abandoning the flat, and did not abandon it. It could have been marked by a buoy by day and a light by night, as directed by the acts of Congress, at least from the time that the water fell to such level that vessels navigating the river would be likely to strike it. The evidence is uncontradicted that the flat could have been marked in 15 feet of water, which was the stage of water 12 days before the collision. As to the amount there is no serious dispute. I do not believe this is a case for apportionment, and hold the respondent liable for all of the damages suffered by the libelant, as averred in the libel, with interest and costs.

Let a decree be drawn accordingly.