LEHIGH & WILKESBARRE COAL CO. v. HARTFORD & NEW YORK
TRANSP. CO.

(District Court, S. D. New York. December 14, 1914.)

NAVIGABLE WATERS ☞24—OBSTRUCTION BY WRECK—LIABILITY OF OWNER—
DUTY TO MARK.

Under Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (Comp. St. 1913, § 9920), which provides that "whenever a vessel * * * is wrecked and sunk in a navigable channel, * * * it shall be the duty of the owner * * * to immediately mark it with a buoy or beacon during the day and a lighted lantern at night and to maintain such marks until the sunken craft is removed or abandoned," the owner of a sunken vessel which has not been abandoned is not relieved from liability for injury to another vessel by reason of misplacement of the marking buoy, by the fact that at such owner's request the buoy was placed by officials of the lighthouse department of the United States.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 66; Dec. Dig. ☞24.]

In Admiralty. Suit by the Lehigh & Wilkesbarre Coal Company against the Hartford & New York Transportation Company. Decree for libelant.

James T. Kilbreth, of New York City, for libelant.

Haight, Sandford & Smith, of New York City (Henry M. Hewitt and W. Parker Sedgwick, Jr., both of New York City, of counsel), for respondent.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

MAYER, District Judge. Having already disposed of the case in so far as the facts are concerned, decision was reserved upon a single question. That question is whether on the facts and the law the responsibility for marking the wreck was shifted by respondent from itself to the government or its officials. For the purposes of this opinion, the following facts may be stated:

On June 3, 1913, Barge 22, owned by respondent, was run into by the steamship Eddie. She subsequently sank to the northward of Red Buoy 14, marking the extreme eastern side of the channel, running along the anchorage ground off Red Hook. The tug Sachem, which had Barge 22 in tow at the time of the collision, stood over the wreck to warn passing vessels until she was relieved by the tug G. H. Dalzell, sent by respondent; the latter vessel remaining on duty until, after consultation with the captain of the Dalzell, a wreck buoy was placed by Captain Karragir, an officer in the service of the Lighthouse Department of the United States.

The United States officials had come to the scene in the lighthouse tender Tulip in response to a notification from the manager of respondent and a request by him that the Lighthouse Board buoy the wreck. After the buoy had been placed the Dalzell went away, and it was not until June 7th that the wrecking equipment of a wrecking company appeared at the place of the wreck and began the work of raising the sunken barge. The delay in this regard was due to the fact that respondent had called for bids from wrecking companies and did not award the contract until June 6th. On June 6th, however, a barge in tow of the tug Plymouth, belonging to libelant, collided with the sunken barge, at that time the sole indication near the wreck being the wreck buoy.

On further consideration I find nothing to change my conclusion that the Plymouth was prudently navigated, that the wreck buoy was improperly located, and that the accident happened because of negligence in that regard. It was at all times the intention of respondent to raise the wreck, and that was subsequently done, and the wreck was not at any time abandoned by respondent. The work done by the Lighthouse Department officials was at the request of respondent, and, as I understand, the government is paid for such work under such circumstances. Presumably the authority under which the wreck buoy was furnished and placed is derived from the act of March 2, 1868 (15 Stat. at Large, 249), which reads as follows:

"That the lighthouse board be, and they are hereby, authorized, when, in their judgment, it is deemed necessary, to place a light vessel, or other suitable warning of danger, on or over any wreck or temporary obstruction to the entrance of any harbor, or in the channel or fairway of any bay or sound."

Long after this act was passed, Congress enacted the act of March 3, 1899 (30 Stat. at Large, 1152). Sections 19 and 20 of that act set forth the procedure in cases where there has been an abandonment of the sunken craft, or where the government takes over the control of sunken craft because of obstruction or danger to navigation. Section 15 defines the duty and responsibility of owners of sunken craft as follows:

"Sec. 15. That it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as sack rafts of timber and logs in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as hereinafter provided for."

The importance of this legislation is obvious, and the tendency of the courts has been to hold owners strictly to the requirement of the statute. Thus, in the leading case of The Anna M. Fahy, 153 Fed. 868, 83 C. C. A. 48, the Circuit Court of Appeals for the Second Circuit held that the duty cast upon the owner cannot be delegated, and the general trend of the decisions under this statute may be gathered from The Macy, 170 Fed. 930, 96 C. C. A. 146; People's Coal Co. v. Second Pool Coal Co. (D. C.) 181 Fed. 609, affirmed Second Pool Coal Co. v. People's Coal Co., 188 Fed. 892, 110 C. C. A. 526; The Mary S. Lewis (D. C.) 126 Fed. 848.

Apparently there is not any reported case where the facts are as here; i. e., where the government officials have marked the wreck in response to the request of the owner, although the owner has retained control at all times. The case of McCaulley v. City of Philadelphia, 119 Fed. 580, 56 C. C. A. 100, is not in point, because there the War Department had taken charge of the removal of a sunken wreck under authority of an act of Congress.

Two English cases are cited in support of respondent's proposition that the duty may be delegated or transferred by the owner to the United States. In The S. S. Utopia, [1893] Appeal Cases, 492, it appears that the port authority undertook the duty of indicating the position of the wreck. In that case the Utopia had been sunk by collision with her majesty's ship Anson, in Gibraltar Bay, on March 17, 1891. From the 17th to the 23d of March, the wreck was lighted by her owners. The acting captain of the port of Gibraltar then complained to the manager for the owners of the Utopia that the lights were not sufficient and were not properly looked after, and gave an order to one Adair, a boarding officer, to have a hulk moored in the vicinity of the wreck in order to warn vessels in accordance with the Board of Trade Instructions. Adair agreed with the owner of a hulk that she should be placed near the wreck in the position and exhibiting the lights described in these instructions, and on the 23d of March the hulk was accordingly anchored and the expense thereof was defrayed by the port authority. It is clear, and so the court holds, that the port authority at Gibraltar had, for the time being, taken away from the owners the duty of lighting the wreck, and had caused that

work to be done as he (the port authority) deemed proper, and thus had relieved the owners of responsibility. It will be seen, therefore, that on facts The Utopia is radically different from the case at bar.

In The Douglas (1882) 7 Probate Division, 151, the facts are much nearer those in the case at bar. If it were not for the act of 1899, that case might be regarded as of much service to the contention of respondent, although I confess that I am not in sympathy with the opinion of the eminent Lord Chief Justice who wrote for reversal. Under the Removal of Wrecks Act 1877, it seems that the harbor master "may" remove any vessel that is sunk and "may" light or buoy her until removal. Cotton, L. J., held that under this act it was the duty of the harbor master to put up lights and remove the obstruction. In effect, he concluded that "may" meant "must." But Lord Coleridge and Brett, L. J., held on the facts that the owners of the wreck should be absolved from responsibility. The facts, briefly stated, were that the Douglas had been sunk in a collision, and her master, having been thrown into the water, was taken in a boat to near Gravesend. A tug called the Endeavour went to Gravesend, where the mate of the Douglas instructed the captain of the Endeavour to go to the harbor master and request him to take care of the wreck. The harbor master said he would do this, and his answer was reported to the mate of the Douglas; but, before any lights were fixed to the wreck, the Mary Nixon struck against the sunken Douglas and sustained the injury in respect of which the action was brought. Lord Coleridge held that on these facts the harbor master undertook to do the duty which he had authority to perform under the statute, and that the mate of the Douglas had fair ground for supposing that he would perform it, and under these circumstances he was of opinion that there was no ground for finding that the master and the mate of the Douglas were guilty of actionable negligence.

If this authority were to be followed, I am frank to say that it would be difficult to distinguish it from the case at bar, were we dealing only with the act of 1868. But it must be assumed that, if there were any exception intended in the act of 1899, such exception would have been written into the statute. The act of 1899 is so phrased that the duty of the owner is expressed in unmistakable terms, and if it was contemplated that the volunteer conduct of officials of the United States would relieve the owners of a vessel not abandoned of the responsibility placed upon them, that intention could have readily been expressed. The fact that it was not expressed in a statute which deals so comprehensively with this general subject-matter is, I think, conclusive upon the proposition that the duty of an owner under this statute cannot be delegated to the United States any more than it can be to a private person.

While occasionally an owner, acting in good faith and intelligently, may, because of the mistaken judgment of a government official, be subjected to hardship, yet in the long run safety of navigation will be better assured and the rights of owners of vessels, injured without fault on their part, better safeguarded, by a strict construction of this statute, rather than by loose construction which will open up new

avenues of escape, more especially as there cannot be any recovery against the government for the misplacing of a buoy by a government official. Flushing Ferry Co. v. United States, 6 Ct. Cl. 1, 7.

I conclude that the libelant is entitled to a decree.