## THE RABBONI.

### THE NELLIE E. RUMBALL.

#### STEWART et al. v. RUMBALL et al.

*(District Court, D. Maine. June 27, 1891.)*

#### No. 92.

**1. COLLISION—SAILING VESSELS.**

Where two sailing vessels are approaching each other nearly head on, or on close parallel lines, one of them sailing closehauled on the starboard tack, and the other going free on the port tack, it is the duty of the latter to keep out of the way, and if a collision occurs she must be held in fault unless she clearly shows that the other vessel was guilty of fault causing the collision.

**2. SAME—DAMAGES—INTEREST.**

A libelant who recovers for a collision is entitled to interest when he has been constantly urgent to bring the case to a decision, and when the claimants have strenuously sought delay in order to procure the testimony of material witnesses, whom they do not finally produce.

In Admiralty. Libel by Thomas J. Stewart and others, owners of the schooner Rabboni, against O. P. Rumball and others, owners of the barkentine Nellie E. Rumball, to recover damages for a collision. Cross libel by the latter against the former for the same collision. Decree for libelants.

Eugene P. Carver, for owners of the schooner Rabboni.

Edward S. Dodge, for owners of the barkentine Nellie E. Rumball.

WEBB, District Judge. Cross libels for damages in a collision between the two-masted schooner Rabboni and the barkentine Nellie E. Rumball, on the morning of October 10, 1888, at a point about midway between Handkerchief lightship and Shovelful lightship.

This collision is attended with more than the ordinary difficulty arising from conflicting testimony. Practically the only important evidence comes from the two captains. At the time of the affair, each was, and for a long time before had been, on the deck of his vessel. Each admits that he was seasonably notified of the approach of the other. They differ not materially as to the exact place where the collision occurred, and somewhat as to the direction of the wind, and the precise course upon which the two vessels had been sail-

ing. These differences might well be attributed to inaccurate observation, especially as one of the captains, at least, does not pretend to have based his testimony on any observation of the compass, and statements of distances are only estimates. But no explanation or solution of their contradictory statements respecting the relative position of the vessels when they were respectively seen, or of their subsequent management and movements, has been found by me, after very long and careful examination of the evidence.

The proctor for the owners of the Rabboni invokes the principle that the testimony of a crew as to what took place on their own vessel is entitled to more weight than that coming from others. Admitting the force of the position, I still find no aid; for the rule is as applicable in this case to one side as to the other. Each party testifies to the movement and management of his own ship, and undertakes to describe that of the other. As one side or the other is listened to, the position and maneuvering is exactly reversed. One side says the vessels were approaching each other starboard to starboard, and on lines that would have kept them a safe distance apart, when the barkentine suddenly ported her helm and ran directly for the schooner's bow, striking her within 30 seconds. On the other side it is said that the approach was on lines on which they would have passed a reasonable distance to the port of each other; but, as they came near, the schooner starboarded her helm and crossed the barkentine's bow, so close at hand that the collision was unavoidable. Each admits that he saw the light of the other at a distance of a mile at least. The hour was a little after 3 in the morning, and the weather such that lights were fairly discernible from a mile and a half to two miles. Both claim to have had regulation lights properly set and clearly burning. The captain of the schooner testifies that he saw both lights of the barkentine in succession; first the green light, and then the red light. The captain of the barkentine says he saw the schooner's red light, but no green light, although, as he struck the schooner on the starboard bow near her fore rigging, he was in position to see it, if burning. The steward of the schooner testifies that it remained brightly burning through the night after the collision, and until taken down at daylight by one of the crew, Peterson. Peterson testifies that it was burning just before the collision, as he knows from seeing its loom on the rigging, but makes no mention of taking it down, and carrying it aft, the next morning, an omission that he would not probably have fallen into if the fact were as the steward relates. Each captain says he examined the other's light with his spyglass. As the captain of the schooner had the wheel and was steering all the time, his use of the glass is not free from doubt. Both captains are men of great experience, and well acquainted with navigation across the shoals. Both appeared well when testifying before the court.

The proctor for the barkentine has carefully and exhaustively analyzed the evidence, and, in a very able and forcible argument, pointed out and urged many inconsistencies and improbabilities in

the case of the Rabboni, which he claims are sufficient to determine the doubts of the case, and put the schooner wholly in the wrong. He especially presses the time that one man had been kept on lookout, without relief, and the absence of that lookout's testimony; the captain's keeping the wheel for some three hours, though a seaman other than the lookout who might have taken it was on deck all the while; the different statements as to courses and wind found in the protest, the libel, the answer to cross libel, and Capt. Tapley's evidence; the inconsequential reason for tacking so far from Shovelful lightship; the improbability that an experienced seaman would have pursued the track stated, and the probability that the schooner would have brought up on the Stone Horse shoal if he had done so. He contends that the testimony from the lightships, and that of the captain of the steamer who towed both vessels to Vineyard Haven the day after the collision, confirms his criticism, and supports the contention on the part of the barkentine, and the allegations of the answer to the libel and those of the cross libel. This argument certainly is persuasive, and leaves my mind in a degree of hesitancy as to the correctness of the conclusion I have reached in respect to these cases,—a lack of such unquestioning confidence as I wish. In justice to the owners of the barkentine, it should be said that their efforts to secure the testimony of the second mate and the two seamen on the lookout and at the wheel at the time of the collision, well known to the court, fully relieve them from any prejudice that might arise from the nonproduction of those witnesses.

But the undisputed and concurrent testimony of all the witnesses from both vessels is that the Rabboni was on the starboard tack, nearly if not not quite closehauled, and the barkentine was sailing free on the port tack. It was then the duty of the barkentine to keep clear, and, failing to do so, the burden is on her to justify her failure and exonerate herself from fault. This is not controverted. The effort has been to avoid the responsibility by showing that the whole trouble was caused by the wrongful and inexcusable navigation of the schooner. Notwithstanding the hesitancy above stated, I do not feel warranted in saying that the burden has been successfully met and the exoneration clearly established. The decree must therefore be in favor of the libelants, Stewart et al., and the cross libel must be dismissed, with costs. Unless the parties agree upon the amount of damages, the assessment will be referred to an assessor.

### ON QUESTION OF DAMAGES.

### (June 27, 1891.)

The questions raised in respect to the amount of damages make it necessary for preservation of legal rights in case of appeal to determine the value of the Rabboni immediately before the collision. Upon this matter of fact the evidence is not so plain as I would like; but, taking it altogether, I can reach no more satisfactory estimate than $3,600. It is true, as contended by respondents, that the judgment of competent experts, who have known and been familiar with the vessel, is more satisfactory than that of equally competent wit-

nesses, who form their estimates from verbal descriptions and data like age, original cost, material used in construction, and the general history of the schooner. But one of the respondents' witnesses, who saw and examined the vessel after completion of repairs after the collision, valued her at $3,500. The surveyors valued the wreck at New Bedford at $800. The bills of everything which entered into the construction and served to restore value amount to $2,984.71.

The proctor for respondents, as I think, rightly contends that the value of any vessel is not to be deemed enhanced in the exact amount of moneys expended in repairs. If it were, the two sums—surveyors' estimate of $800 for the wreck, and the $2,984.71 expended for restoration—would give us a value of $3,784.71. It is true that there may be, by reason of the substitution of new material for old, an increase in value to some extent. But on the whole, I, as before said, adjudge the value to have been $3,600. In addition to $2,984.71, that actually went into hull, chains, anchors, spars, sails, and rigging, are shown undisputed bills amounting to $711.57, viz.:

| | |
|---|---:|
| New Bedford towboat | $ 54 00 |
| Carting cargo | 5 00 |
| Surveyors | 18 00 |
| Towage | 320 00 |
| Furniture lost | 17 00 |
| Stores lost and injured | 31 06 |
| Clothing and charts | 41 60 |
| Captain's fares | 2 35 |
| Repairing clock | 1 05 |
| Restowing cargo | 1 50 |
| Discharging and pumping | 127 36 |
| Carting and loading cargo | 92 65 |
| | $711 57 |

These items are properly chargeable, unless by reason of some breach of duty or gross lack of prudence the repairs were inexcusable. These bills, together with the $2,984.71, make an aggregate of $3,696.28, certainly not so in excess of the value I have placed on the vessel as to indicate such improvidence as amounts to a fault, working forfeiture of claim for restitution.

The principal objection is made to the item of demurrage for 33 days at $24 per day, amounting to $792. That this number of days actually elapsed between the collision and the completion of repairs and reloading, and that the rate per day is reasonable, is not disputed; but it is claimed that an unnecessary number of days were consumed by want of diligence, and it is further urged that under the circumstances of the value of the Rabboni, and the sum it would cost to repair her, no demurrage should as matter of law be allowed. I am persuaded that some time was lost through the inactivity and inattention of the master and owners of the Rabboni, and for that time the respondents cannot be properly held. For this, a deduction of five days will be ample. The other objection I overrule. Then, adding $672 for demurrage to $3,696.28, we have $4,368.28 to be allowed.

Interest is claimed on this allowance from November 24, 1888, the date when the bills were finally paid. In view of the facts of this

case, I think that this interest also should be allowed. The libelants were constantly urgent to bring the case to a decision, and the claimants strenuously sought delay, in consequence of the absence of material witnesses, till at last the court gave a final allowance of time to procure the attendance or the depositions of those witnesses, and the case was heard without them.

```
Interest on.............................................$4,368 28
From November 1888, to June 24, 1891, is................  416 16
                                                        ----------
    Amounting to........................................$4,784 44
```

—For which, with costs, let a decree be now entered.