EASTERN S. S. CORPORATION v. GREAT LAKES DREDGE & DOCK CO.

GREAT LAKES DREDGE & DOCK CO. v. EASTERN S. S. CORPORATION.

(Circuit Court of Appeals, First Circuit. March 7, 1919.)

Nos. 1354, 1355.

1. SHIPPING ☞204—LIMITED LIABILITY—"VESSEL."

A temporarily sunken drillboat, used for removing ledges, *held* a "vessel," within Rev. St. §§ 4283–4289 (Comp. St. §§ 8021–8027), limiting the liability of vessel owners for collisions occurring without their privity or knowledge.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Vessel.]

2. SHIPPING ☞208—LIMITED LIABILITY—AGENT'S KNOWLEDGE.

The privity or knowledge of a vessel owner's superintendent having general control and direction of its business at Boston *held* the owner's knowledge or privity, within Rev. St. §§ 4283–4289 (Comp. St. §§ 8021–8027), limiting the vessel owner's liability for damages incurred without his privity or knowledge.

3. SHIPPING ☞209(3)—LIMITED LIABILITY—EVIDENCE.

Evidence that owner of a drillboat was notified of its sinking some three-fourths of an hour before a steamship collided with it, that he was then some three miles from the wreck, etc., does not sustain a finding that he had sufficient opportunity to mark the wreck after receiving news of the sinking and before the collision.

4. NAVIGABLE WATERS ☞24—WRECK—DUTY TO MARK—KNOWLEDGE OF OWNER.

Act March 3, 1899, § 15 (Comp. St. § 9920), requiring owners of craft sunken in navigable channels to mark their location, is a criminal statute, and the duty imposed does not arise until the owner receives knowledge that his vessel has been sunk.

5. SHIPPING ☞208—NEGLIGENCE—MARKING WRECK.

A dredge company, locating its drillboat on a ledge in a Boston harbor channel, is charged with knowledge that accidents were liable to occur if it sank and was not marked in a suitable manner, and it was negligent if it failed to man the drillboat with men instructed and reasonably competent to perform the marking.

6. SHIPPING ☞209(3)—NEGLIGENCE—EVIDENCE.

Evidence that foreman of a drillboat had some 25 years' experience and knew what should be done in case the boat sank, although he was negligent in failing to mark the wreck, *held* not to show that he was incompetent, or that his employer should reasonably have known that he was.

7. SHIPPING ☞209(3)—NEGLIGENCE—EVIDENCE.

Evidence that engineer on a drillboat had never been instructed to mark the boat in case it sank, and did not know this was required, did not establish the owner's personal negligence.

8. SHIPPING ☞207—LIMITATION OF LIABILITY—NEGLIGENCE.

A dredge company *held* chargeable personally for damages resulting from a collision with its sunken drillboat, where it failed to instruct a watchman to mark the boat in case it sank.

9. SHIPPING ☞209(3)—LIMITED LIABILITY—BURDEN OF PROOF.

A vessel owner, seeking to limit its liability for damages resulting from a collision, has the burden of showing that it exercised reasonable care and diligence in manning its boat with competent men.

10. COLLISION ☞130—DAMAGES—INTEREST.

Awarding a vessel injured by collision interest on damages for loss of property from date of collision, on sums paid for repairs from dates of

payment, and on demurrage from time when damages were liquidated, is within court's discretion.

11. ADMIRALTY ⚍124—COSTS—MILEAGE.

Mileage of witness in a maritime collision case *held* taxable from the place from which he was summoned, although his domicile was at a nearer point.

Anderson, Circuit Judge, dissenting in part.

Appeals from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Petition to limit liability by the Great Lakes Dredge & Dock Company, to which the Eastern Steamship Corporation, as damage claimant, filed an answer. From a decree (250 Fed. 916), both parties appeal. Affirmed upon appeal of Great Lakes Dredge & Dock Company, and appeal of the Eastern Steamship Company dismissed, without costs.

Charles E. Kremer, of Chicago, Ill., and Fitz-Henry Smith, Jr., of Boston, Mass., for Great Lakes Dredge & Dock Co.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for Eastern S. S. Corporation.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. No. 1355 is an appeal from a decree of the District Court for Massachusetts, dismissing the petition of the Great Lakes Dredge & Dock Company, brought under sections 4283–4289 of the Revised Statutes (Comp. St. §§ 8021–8027), to have its liability to the Eastern Steamship Corporation for a collision between the corporation's steamship, the Massachusetts, and the dredge company's drillboat No. 4 determined, and, if liable, the damages limited.

Appeal No. 1354 arises out of the subject-matter of the appeal in No. 1355 and involves certain questions that become material only in case the dredge company is held liable for the collision, but is entitled to have its damages limited.

The collision occurred July 5, 1913, at about 8:18 a. m., at which time the drillboat lay submerged in the channel of Boston Harbor on what is known as the Spectacle Island upper ledge. Under the direction of the court the drillboat was appraised as she lay on the bottom at $13,568, and a stipulation for that amount was filed by the dredge company.

In the District Court the dredge company was held personally and solely at fault, and damages were assessed at $70,499.65, with costs of $617.92.

We fully agree with the findings and rulings of the court below that the dredge company was at fault in that its subordinate agents and servants failed to exercise reasonable care to mark the drillboat after it was sunk, and that the Massachusetts was not at fault in failing to discover the wreck in season to avoid the collision. The dredge company, however, contends that it was not personally at fault; that, on a fair consideration of the evidence contained in the record, it was with-

---

out that privity or knowledge essential to charge it with personal responsibility.

The evidence discloses that drillboat No. 4 was about 132 feet long, 33 feet beam, and about 8 feet deep; that it was divided into five water-tight compartments, and carried a boiler, drilling machinery, four two-cylinder engines, and other apparatus used in connection with its work. It was built of steel, and, when at work on a ledge, was held in place by four spuds or iron legs 65½ feet long, about 23½ inches square, and weighing 12½ tons each. The spuds were moved up and down in casings about 13 feet long. The casings at their lower ends were flush with the bottom of the boat and extended above the deck about 6 feet. The spuds were located near the corners of the boat, and their lower ends, which were tapered to about 6 or 8 inches square, rested on the ledge or bottom. They were raised or lowered by steam engines operating geared pinions engaged in a rack on each spud. There was a valve on the engines, which, on being turned in a given direction, would permit the engines automatically to aid in moving the spuds up or down according as the tide rose or fell. When the spuds stood perpendicularly, the boat would work up and down automatically with the tide; but sometimes they would jam, and to provide for such cases steam was kept on the engines. The drillboat was towed from the Great Lakes around through the St. Lawrence to Boston Harbor. When being towed, the spuds are raised and held by pawls fastened to the deck.

In the summer of 1913 the dredge company had a contract with the United States government for the removal of ledges in Boston Harbor. Under this contract drillboat No. 4 had been at work for about two weeks before the accident on a ledge almost in the center of the deep channel, which at that point was something over a quarter of a mile wide. There was some twenty-six feet of water over the ledge, so that only vessels of very deep draft paid any attention to it. It was the plan of the government to make a 35-foot channel which would be safe for ships of the deepest draft. No work was done by the drillboat during the day and night of July 4. About 6 o'clock on the evening of July 4, the night crew, when the drill was not working, consisting of Folz and Murphy, went aboard. Folz acted as watchman and mechanic; Murphy acted as fireman. High water occurred about midnight. In the neighborhood of 1 o'clock Folz, who had been working in the pump room, noticed that the drillboat had taken a pronounced list. He went on deck and found that the two front spuds had jammed, so that that side was not lowering with the tide, but was then from a foot to 15 inches higher than the back side of the boat. He tried to start the spuds with the engines, but was unsuccessful. He then called Murphy, and they worked at the spuds with bars, but with no better success. As the tide continued to ebb, the boat tilted more and more. Attached to the drillboat were two scows carrying dynamite, a yawlboat, and a rowboat. About 1·45 a. m., finding that the drillboat was sliding and about to tip over, they jumped upon one of the dynamite scows. One of the two ropes which held the scows to the drillboat, being entangled with the fenders

hanging over the side of the drillboat and it being dark, they cut, and the other parted when the drillboat tipped over.

There were plenty of oars for the yawlboat and the rowboat on the deck of the drillboat, but they were washed overboard before the men took to the scows, and there was only one oar in the yawlboat. The scows and yawlboat with the men drifted on the outgoing tide towards the lower harbor until about 3:30 a. m., when they were picked up by the tug Sadie Ross and were slowly hauled up past the sunken drillboat No. 4 to drillboat No. 8, belonging to the dredge company, and which was located about 6,400 feet further up the harbor. As they came past drillboat No. 4, it would have been entirely feasible for them to have stopped and anchored the yawlboat to the sunken drillboat, whose sand·pipes were then extending out of the water some 3 and 6 feet, respectively, and thus have marked it as a warning. This, however, was not done. They reached drillboat No. 8 at about 5:30 a. m. About 6 a. m. a Boston police boat called at drillboat No. 8 and inquired if the men who had been adrift were there, and on receiving an affirmative answer left, without being told of the wreck or asked to mark it. About 6:15 or 6:20 the day crew of No. 4 arrived at drillboat No. 8, with Hancock, the foreman of No. 4, and after making observations of the wreck, and seeing that the sand pipes were projecting out of the water, as he thought some $2\frac{1}{2}$ and 5 or 6 feet, Hancock went ashore with the men, including Folz, to find Superintendent Williams. While they were ashore looking for Mr. Williams, the steamship Massachusetts came in from New York and at about 8:18 ran into the wreck, which was then submerged.

[1] In considering the right of the dredge company to a limitation of its liability under section 4283, it is necessary to determine whether its drillboat No. 4 was a vessel, as defined in section 4289, as amended by Act June 19, 1886, c. 421, § 4, 24 Stat. 80 (Comp. St. § 8027).

The word "vessel," as there defined, applies "to all seagoing vessels, and also to all vessels used on lakes or rivers in inland navigation, including canal boats, barges and lighters," and has been held to include a barge without motive power used for transporting excursion parties (In re Myers Excursion & Navigation Co. [D. C.] 57 Fed. 240; The Republic, 61 Fed. 109, 9 C. C. A. 386); a mud scow used in Boston Harbor for moving mud (In re Eastern Dredging Co. [D. C.] 138 Fed. 942); a scow originally constructed and used for carrying stone, and later provided with a derrick and used for raising stone (The Sunbeam, 195 Fed. 468, 115 C. C. A. 370); and a scow carrying a pile driver permanently attached thereto (In re Sanford Ross [D. C.] 196 Fed. 921, Id., 204 Fed. 248, 122 C. C. A. 516).

Revised Statutes, § 3 (Comp. St. § 3), defines what craft are vessels for the purposes of the maritime law, and in In re Eastern Dredging Co. (D. C.) 138 Fed. 942, 944, it was held that "all craft which are vessels for the purposes of the maritime law are vessels within the intent of the act as it now stands," meaning within the intent of the act of 1851 (sections 4283–4289) as amended in 1886. In the case of Charles Barnes Co. v. One Dredgeboat (D. C.) 169 Fed. 895, Judge Cochran, after an extended review of the cases in an endeavor to as-

certain what was a vessel within the meaning of section 3, held that a navigable structure, intended for the transportation of a permanent cargo, and that had to be towed in order to navigate was a vessel. The vessel there in question was a pumpboat. It consisted of a floating structure, equipped with an engine, boiler, pumps, pipes, and capstans, which were permanently attached, and it was used for pumping out coal barges.

Drillboat No. 4 was a navigable structure having a permanent cargo, viz. its engines, boiler, drilling machinery, etc., which it transported from place to place for the purpose of removing ledges in navigable waters and as an aid to commerce and navigation. It was not a floating dry dock intended to be permanently moored, as was the case in Cope v. Vallette Dry Dock Co., 119 U. S. 625, 7 Sup. Ct. 336, 30 L. Ed. 501; but was intended and used for the transportation of a cargo which it carried from place to place to remove ledges. We are therefore of the opinion that it was a vessel, within the meaning of sections 4283–4289, as construed in the cases above cited.

We also think that the drillboat, by being temporarily sunk, did not cease to be a vessel, and that the dredge company is not to be deprived of the benefit of the provisions of section 4283, provided the fault that caused the collision was without its privity or knowledge, or that of its general manager, Williams. In the Sanford Ross (D. C.) 196 Fed. 921, 926, an accident occurred on a scow fitted out as a pile driver while it was resting upon the bottom at low tide, and it was held that the scow did not lose its character of a vessel by being grounded temporarily, as it was the intention that it should be towed before proceeding to the next position for driving piles.

In the District Court the dredge company's claim for a limitation of liability was denied upon the grounds: (1) That the drillboat, at the time it was sunk, was improperly manned, in that neither Folz nor Murphy were men fitted to exercise, under conditions which might reasonably be foreseen, prudent and careful seamanship, and was therefore unseaworthy; that this fault was attributable to the petitioner personally, and was the cause of the accident, as Folz and Murphy, whose duty it was to take steps, after the sinking, to warn other vessels of the wreck, failed to do so because of their incompetency; and (2) that Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (Comp. St. § 9920), as construed in the Anna M. Fahy, 153 Fed. 866, 83 C. C. A. 48, in The Macy, 170 Fed. 930, 96 C. C. A. 146, in Weisshaar v. Kimball S. S. Co., 128 Fed. 397, 402, 63 C. C. A. 139, 65 L. R. A. 84, and in J. Smith & Sons, Inc., 193 Fed. 395, 113 C. C. A. 391, made it the personal duty of "the owner of such sunken craft to immediately mark it," and that this duty could not be delegated, so as to relieve the owner from responsibility. In holding the dredge company liable on this ground, the court evidently assumed that, inasmuch as Williams was the general superintendent of the petitioner's operations around Boston and the petitioner was a corporation, the privity or knowledge of Williams was the privity or knowledge of the petitioner, for it found "that Williams was informed that the drillboat had sunk early enough so that, if he had sharply set about marking the

wreck, he could have done so before the collision," and that his negligent and unexcused failure to do so was a disregard of the statutory duty and attributable to the petitioner personally.

[2, 3] We agree with the court below that, inasmuch as Williams had the general control and direction of the company's business at Boston, his privity or knowledge was the privity or knowledge of the corporation. Craig v. Continental Ins. Co., 141 U. S. 638, 646, 12 Sup. Ct. 97, 35 L. Ed. 886; Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co. (D. C.) 162 Fed. 912; The Erie Lighter (D. C.) 250 Fed. 490, 494. But we do not think that the evidence warrants the finding that he was informed of the sinking of the drillboat sufficiently early, so that he could reasonably have been expected to have marked the wreck before the collision occurred. The collision occurred July 5, 1913, not later than 8:18 a. m., and the evidence was that Mr. Williams was not informed of the sinking of the drillboat until 7:30 that morning, when he was found by Hancock at the Atlantic works, some three miles or more distant from the wreck, and that, upon procuring a launch, he and Hancock started for the wreck, and while on their way passed the Massachusetts going to her dock in Boston Harbor. The collision had then taken place, and we do not think it could reasonably be found that he had a sufficient opportunity to mark the wreck after he knew that the drillboat was sunk and before the accident occurred.

[4] The statute of 1899 is a criminal statute, and the failure of duty on the part of the owner of a vessel sunk in navigable waters there penalized is failure to mark the wreck after knowledge of the fact necessitating the performance of the duty; and the duty there imposed upon the owner as a basis for civil liability cannot be greater and will not arise until after knowledge that the vessel is a wreck. This is the construction placed upon the statute in The Fahy and other cases above cited. The act of 1899, therefore, is not, as has been suggested, in conflict with section 4283, but in harmony with its provisions, for the duty imposed on the owner is a personal one.

[5] Was it the duty of the petitioner to see that the drillboat was manned with men fitted to exercise, under conditions which might reasonably be foreseen, prudent and careful seamanship, and does the evidence disclose that Folz and Murphy, by previous training and experience, were incompetent, or that Hancock, the foreman, was likewise incompetent and that this was known, or ought to have been known to Williams?

If there was a duty cast upon the owner to see that the drillboat was properly manned, it did not arise out of a contract relation, for there was no contract between the dredge company and the steamship company. The duty therefore arose, if at all, out of some other relationship of the parties, and was one imposed by law due to that relationship. The law governing actions for negligence has for its foundation the rule of reasonable conduct. That rule has to do with one's acts with reference to the person, property, or rights of another. It is a rule of relation. If there be no relation, there is nothing upon which the rule can operate. But when one knows or has reason to

believe his conduct may affect injuriously the person or property of another, then a duty arises requiring him to exercise reasonable care to see that his acts do not result injuriously to the person or property of that other.   So, when the dredge company located its drillboat on the ledge in the channel in Boston Harbor, knowing, as it must, that ships would be navigating in that locality and that accidents were liable to occur, in case it sank, if it was not marked in a suitable manner, the law imposed upon it the duty of manning the drillboat with men charged with the duty of marking the wreck and reasonably competent to perform that duty.

In the District Court it was found that Folz, Murphy, and Hancock were all thoroughly competent men for the operation of drillboats, but that none of them appeared to have been competent seamen, or to have had any general knowledge of vessels or the proper management of them.   The evidence shows that Hancock, at the time of the accident, had been engaged for 25 or 28 years in the handling of drillboats; that he helped to build drillboat No. 4 in 1907 or 1908, and "bring her out"— probably meaning bring her from the Great Lakes to Boston—and that he had been the foreman of her most of the time since; that he knew that the act of 1899 required the owner of sunken wrecks to mark them; and that he would have done so at the time he observed the wreck, had he not thought that the two sand pipes, which were about 6 inches in diameter and protruded out of the water $2\frac{1}{2}$ and 5 or 6 feet, respectively, at the time he observed them, sufficiently marked it.   Hancock had worked in Boston Harbor on this drillboat since October, 1911, a period of nearly 2 years.   He knew that the mean rise of the tide in that locality was then about $9\frac{1}{2}$ feet, and, if his testimony is to be believed, his judgment was, on observing the wreck, that it would not rise sufficiently to cover and obscure the protruding sand pipes.   He no doubt was wrong in entertaining this idea, and was negligent in acting upon it without marking the wreck; but it is difficult to believe that the petitioner should be held personally at fault for putting him in charge of the drillboat, in view of his long experience and his knowledge of what it was necessary to do in case the drillboat sank, and we think that it cannot fairly be said that he was incompetent, or that the petitioner or Williams ought reasonably to have known that he was.

[6-8] As to Folz and Murphy, the evidence was that Murphy's duty was to run the boiler to keep up steam for the engines; that he was a marine fireman with $11\frac{1}{2}$ years' experience, and had a license; that he had been employed on drillboat No. 4 for 8 months, and that he had had much experience the past 11 years in going to sea, during which time he acted as fireman.   He had never been instructed to mark the drillboat in case it sank, and he did not know that the owner of a sunken vessel was required to mark it, and it would seem that it was not reasonably necessary that he should have known or been so instructed, as his work was that of an engineer.   The duty of placing warning signals, to the extent at least of hanging out lights, devolved upon Folz, who was required, when he came on duty at night, to light all the lights and hang them out at both ends of the drillboat and look after the

spuds. Folz had worked on drillboats for 5 or 6 years, and on this boat since some time in 1911. When the drillboat was in operation, he had to do with the blasting of the holes that were drilled, and when it was not in operation he worked as a watchman. He testified that he knew the owners of vessels sunk in navigable waters were required to mark them, but that he had never been instructed by the foreman or any one representing the dredge company to mark the drillboat in case she sank, and Williams testified that he had never instructed his men, in the event of the drillboat sinking, to mark it, although that duty would devolve upon him, if any instructions were necessary. Folz's testimony also shows that from about 5:30 to 6:30 on the morning of the accident he had ample opportunity to mark the wreck and means at hand with which to do it. He then knew that the tide was rising, or was about to rise, but what he knew as to the mean rise of the tide did not appear. It is as probable that he did not know what the mean rise of the tide was as that he did, and that he had no means of judging whether it would rise and obscure the sand pipes or not. He made no effort to mark the wreck or to have any one else mark it. He could have asked the police boat at 6 a. m. to do so if he had understood it was his duty to have it done, but he did not. In view of his conduct at the time, and of the fact that no one representing the company had told him that it was his duty to mark the boat in case she sank, or how to do it, we think it is more probable than otherwise that he did not regard it as his duty, and for this reason omitted marking her. As due care on the part of the dredge company or its general manager, Williams, required that it should have directed Folz to see that the boat was marked in case she sank, and it failed to do so, its failure in this respect was the cause of the collision, and was a fault for which it was chargeable personally.

It is contended that the dredge company had no reason to anticipate that the drillboat might sink, and therefore it was not called upon to instruct Folz what to do in such a contingency; but, as it was generally known that vessels in encountering the perils of the sea were liable to be sunk, and also known that drillboats and dredges, supported by spuds, when subjected to like perils, had sunk, we think it was bound to have foreseen that such a situation might arise, and that it should have instructed Folz with reference thereto.

[9] The burden was upon the dredge company to show that it exercised reasonable care and diligence to see that the drillboat was manned with competent men. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1183; The Wildcroft, 201 U. S. 378, 388, 26 Sup. Ct. 467, 50 L. Ed. 794; International Navigation Co. v. Farr, etc., Mfg. Co., 181 U. S. 218, 225, 226, 21 Sup. Ct. 591, 45 L. Ed. 830. In recognition of this, the dredge company, in its petition, alleged as follows:

"At the time of the sinking of the said drillboat No. 4, the same was in every way seaworthy and fit and proper for the uses for which it was built and used, and that its appliances were in good condition, it had on board a sufficient number of competent men, and that the said sinking of the said drillboat No. 4 and the collision with the same by the said steamer Massachu-

setts, were occasioned or incurred without the privity or knowledge of this petitioner."

It failed to sustain the burden of this allegation.

[10] The dredge company also complains that the District Court erred in its allowance of interest on the damages awarded for loss of property from the date of the collision, on the sums paid for repairs from the dates of payment, and on demurrage from the time when the damages were liquidated. The allowance of interest in cases of this kind rests in the discretion of the court. The Albert Dumois, 177 U. S. 240, 255, 20 Sup. Ct. 595, 44 L. Ed. 751; The Scotland, 118 U. S. 507, 518, 6 Sup. Ct. 1174, 30 L. Ed. 153; Straker v. Hartland, 2 H. & M. 570, 575; Frazer v. Bigelow Carpet Co., 141 Mass. 126, 4 N. E. 620; The Rabboni (D. C.) 53 Fed. 948, 952. Complete restoration required the payment of interest. Judge Hazel, in discussing the question of the allowance of interest in collision cases in The Gilchrist (D. C.) 173 Fed. 666, at page 672, said:

"On the settlement of final decree the question arose whether interest on demurrage should properly be allowed from the date of loss, as specified in the stipulation filed herein, or from the entry of decree. Heretofore this court apparently held in The Sitka [D. C.] 156 Fed. 427, on the authority of The Eloina [D. C.] 4 Fed. 573, that interest on demurrage was only recoverable from the date of decree, and not from the date of loss or injury. But this broad holding is not sustained by the weight of prior decisions. Collision cases are now called to my attention by which it is clearly shown that, not only is demurrage a proper element of damage, but that interest should be allowed from the time of collision, unless in the discretion of the court there are special reasons for its disallowance."

[11] The dredge company further contends that the court below erred in allowing taxation of mileage for one Colbath, a witness for the steamship company, from New York City to the place of trial, although his domicile or home was in Melrose, Mass. The taxation was in accordance with the previous rulings of this court. City of Augusta, 80 Fed. 297, 304, 25 C. C. A. 430; United States v. Sanborn (C. C.) 28 Fed. 299; The Governor Ames, 187 Fed. 40, 50, 109 C. C. A. 94.

In view of the conclusion here reached, the questions sought to be raised in No. 1354 become immaterial and are not considered.

In No. 1355 the decree of the District Court is affirmed, with interest and costs to the appellee; in No. 1354, the appeal is dismissed without costs.

ANDERSON, Circuit Judge (dissenting in part). In the conclusion that the dredge company is not entitled to limit its liability I concur. From the reasoning of the foregoing opinion I am constrained to dissent; I think it lays down propositions unsound and fraught with serious danger.

(1) I do not think this drillboat was a vessel within the meaning of the limited liability acts. I think the weight of authority and of sound argument is that it was not a vessel.

R. S. § 3, defines a vessel as follows:

"The word 'vessel' includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

Was this drillboat a "means of transportation" within the fair meaning of those words? Its essential character was that of a marine machine shop. When at work it rested on the earth. Its work was not carriage; it was drilling. True, its legs could be drawn up, and it could then be towed by a tug from place to place. It was somewhat like a pontoon or dry dock. But the Supreme Court held in Cope v. Vallette Dry Dock Co., 119 U. S. 625, 7 Sup. Ct. 336, 30 L. Ed. 501, that a dry dock, consisting of a large oblong box with flat bottom and perpendicular sides, with no means of propulsion either by wind, steam, or otherwise, and not destined for navigation, but only as a floating dry dock permanently moored, was not a vessel. Mr. Justice Bradley said:

"The fact that it floats on the water does not make it a ship or vessel, and no structure that is not a ship or vessel is a subject of salvage. A ferry bridge is generally a floating structure, hinged or chained to a wharf. This might be the subject of salvage as well as a dry dock. A sailor's floating bethel, or meetinghouse, moored to a wharf, and kept in place by a paling of surrounding piles, is in the same category. It can hardly be contended that such a structure is susceptible of salvage service."

I regard the reasoning in that case as practically concluding the point.

Undoubtedly, as pointed out by Judge Dodge in the case of The Scow No. 34 (see In re Eastern Dredging Co. [D. C.] 138 Fed. 942, 945), the amendment of 1886 extended the scope of the limited liability act of 1851. That act originally provided in express terms that it should not apply to owners of canal boats, barges, or lighters. Compare Simpson v. Story, 145 Mass. 497, 14 N. E. 641, 1 Am. St. Rep. 480. But barges and lighters, now included, are to some extent commercial carriers. They may fairly be called a part of our merchant marine. Clearly, the original purpose of Congress was to encourage investments in ships and to promote commerce upon the high seas. When the act was extended to cover barges and lighters, the basic notion of promoting commerce and navigation by increasing carrier service was not, in my view, abandoned. Congress did not, as it seems to me, intend to limit the doctrine of respondeat superior for the benefit of every owner of anything which could be floated and which might, as an incident of its use, occasionally be floated. A dry dock was floated from the United States to the Philippines. The facts that it was floated and (to use the language of the majority opinion) was "an aid to commerce and navigation" did not make it a vessel within the meaning of the limited liability acts. A bell buoy floats and is an aid to navigation; is it a vessel? Piers and lighthouses are great "aids to navigation." So is every means of improvement of navigable waters. But something more is necessary in order to make the "aid" a "vessel," within the meaning of the limited liability acts.

It is true that in the P. Sanford Ross Case (D. C.) 196 Fed. 921, it

was held that a barge on which was mounted a pile driver, described as "a permanent cargo," was a vessel within the limited liability acts. But this pile driver might have been removed and the barge used for ordinary transportation work. Drillboat No. 4 was much more like the dry dock than like the barge with the attached pile driver.

Judge Cochran's able and exhaustive review of the cases in 169 Fed. 895, shows that the courts have hitherto extended the statute to the very verge. I think this decision, holding this long-legged steel box or marine machine shop to be a vessel, goes beyond any decision hitherto made, and extends the statute to the point of perverting the congressional intent.

To hold that this drillboat was a vessel is nearly, if not quite, to change the statutory definition so as to read: "The word 'vessel' includes every artificial contrivance capable of being floated." It eliminates the idea that the thing floated shall be "a means of transportation"—that is, that it shall perform some carrier function.

The determination of this case does not, in my opinion, require us to hold that this drillboat was a vessel. To extend the doctrine of limited liability to everything floated and floatable is, in my view, to menace, and not to promote, commerce and navigation.

(2) This drillboat, whether vessel or not, was negligently sunk in a navigable channel. There was no vis major to account for the sinking. There was something wrong with the construction, the state of repair, the manning, or the operation, else it would not have sunk in a smooth summer sea. Res ipsa loquitur. 29 Cyc. 590. But, even if the original sinking had not been negligent, I agree with my Brethren in holding that there was negligence both of owner and employé in failure promptly to mark the submerged obstruction, so as to warn those rightly using the navigable channel of its presence. The negligent creation and maintenance of this obstruction, in this navigable channel, a great public highway, constituted a public nuisance. The unlawful obstruction of a public highway has always been a public nuisance. Joyce on Nuisances, § 214; Woodman v. Pitman, 79 Me. 456, 462, 10 Atl. 321, 1 Am. St. Rep. 342. Any individual suffering special and material damage from a public nuisance can recover therefor from the one causing such nuisance. Joyce on Nuisances, §§ 218, 219, 220; Staples v. Dickson, 88 Me. 362, 34 Atl. 168.

The case ought, in my view, to be determined on the simple and elementary principles laid down by the Massachusetts Supreme Judicial Court in Boston & Hingham Steamboat Co. v. Munson, 117 Mass. 34. That was a case to recover for injuries to the plaintiff's steamboat caused by running upon a sunken scow belonging to the defendant. The defendant, while trying to raise the scow, left the public unwarned of the obstruction caused by it. The court said:

"If a person negligently places an obstruction in a highway, he is liable for any injury caused thereby to a traveler using due care. So if a person negligently obstructs navigable waters, he is liable for injuries caused to vessels in the proper use of such waters. * * * When a vessel is sunk by unavoidable accident, in navigable waters, whether in the usual track of navigation or not, the owner, until he abandons, must use due care to prevent injury to other vessels"—citing White v. Crisp, 10 Exc. 312; Brown v. Mallett, 5 C. B. 599.

To my mind this statement covers everything that needs to be said about the case at bar.

The same principle was asserted in the case of The Snark, [1900] P. D. 105; also in the case of The Utopia, [1893] App. Cas. 492.

A sunken vessel in navigable waters, even if abandoned, may, and ordinarily does, constitute a public nuisance. Detroit Water Commissioners v. Detroit, 117 Mich. 458, 76 N. W. 70. Apart from statute, the owner of a sunken vessel had the right to abandon it, and after abandonment would apparently not be liable for maintaining a public nuisance. Rex v. Watts, 2 Esp. 675; Winpenny v. Philadelphia, 65 Pa. 135; Ball v. Berwind (D. C.) 29 Fed. 541.

So far as I have been able to discover, it has never hitherto been even contended that liability for creating or maintaining a public nuisance in navigable waters is subject to the limited liability acts. England has had a limited liability act since 1734. Stat. 7 Geo. II, c. 15. Rev. Stats. § 4283, taken from the act of 1851, was grounded mainly upon the English statutes of 26 Geo. III, passed in 1783, and 53 Geo. III, passed in 1813. But I have not been able to find that in England it has ever been claimed that these English acts limited liability for the negligent obstruction of navigable waters.

Our own limited liability act was passed nearly 70 years ago. It would be extraordinary if this be the first instance in which a negligently sunken barge or vessel has as a wreck caused damage in excess of its own salvage value. But I can find no case in this country in which it has been claimed that liability for wrecks, negligently caused or maintained in navigable waters, is limited by the acts passed to encourage shipowners and to promote navigation.

Navigation will not be promoted by lessening liability for the creation or maintenance of public nuisances in navigable waters. Congress has appropriated hundreds of millions of dollars for the improvement of navigable waters. It is to my mind inconceivable that responsibility, arising under elementary principles, for obstructing navigable waters, was intended by Congress to be held subject to the limited liability acts. If there is any field in which the doctrine of respondeat superior should be held in full force and effect, it is in the field of the creation or the maintenance of public nuisances in the sea highways.

The history and policy of the limited liability acts are dealt with elaborately in Walker v. Transportation Co., 3 Wall. 150, 18 L. Ed. 172; Moore v. Amer. Transportation Co., 24 How. 1, 16 L. Ed. 674, a decision in 1861; New York Transportation Co. v. Wright, 13 Wall. 104, 20 L. Ed. 585; La Bourgogne, 210 U. S. 95, 120, 28 Sup. Ct. 664, 52 L. Ed. 973; Providence Steamship Co. v. Hill, 109 U. S. 578, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038; Butler v. Boston & Savannah Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, 32 L. Ed. 1017; The City of Norwich, 118 U. S. 468, 6 Sup. Ct. 1150, 30 L. Ed. 134; Walker v. Boston Insurance Co., 14 Gray (Mass.) 288; Hill v. Prov. S. S. Co., 113 Mass. 495, 18 Am. Rep. 527; same case, 125 Mass. 292. See, also, The Main v. Williams, 152 U. S. 122, 14 Sup. Ct. 486, 38 L. Ed. 381; Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110.

In none of these cases do I find any countenance or support for the doctrine of holding these acts applicable to cases of negligence in obstructing navigable waters.

Under the doctrine asserted by the majority opinion in this case, the financially responsible owner of a barge or scow, negligently sunk or negligently left unmarked in a navigable channel, might with practical impunity do hundreds of thousands of dollars of damage to great ships, perhaps destroying lives. Such a doctrine is, it seems to me, unwise and an unnecessary shield for negligence in selecting and instructing and training employés. There is a great practical difference between holding the owner of an obstruction in navigable waters, negligently caused or maintained, responsible for all acts of negligence of all his employés, and the doctrine laid down by the majority, which throws the burden upon the victim of the negligent injury of showing specific negligence in the selection or instruction of the particular employé guilty of the default causing the damage.

Of course, if Congress has passed laws leading to such undesirable results, it is our duty to enforce them; but I am unable to believe that the national Legislature intended to ground any such sea highway policy.

Certainly the limited liability acts do not, in terms, destroy the common-law right of the victim of negligence in obstructing a public highway to recover damages suffered. As stated by Justice White in Texas, etc., Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 437, 27 Sup. Ct. 350, 354 (51 L. Ed. 553, 9 Ann. Cas. 1075):

"We must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common-law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

Full efficacy will be given to the limited liability statutes without extending them to cover negligence of shipowners' servants in causing or maintaining hidden traps for other vessels in navigable waters. The statutory right and the original common-law right are not only not repugnant, but they both make for the same end, to wit, the safety of property invested in vessels.

I think a sunken wreck, left unmarked either temporarily or permanently, is a menace to navigation, differing not only in degree, but in kind, from the danger to other vessels arising from the careless navigation of a vessel still afloat, just as a moving automobile is an entirely different sort of peril from the unmarked wreck of an automobile in the dark. As long as a vessel is afloat, however careless the navigators, regard for their own safety impels them to some degree of care to avoid collision with other vessels. So long as a vessel is afloat and visible, however badly handled, other vessels have a chance, by using extraordinary care and skill, to avoid the results of the negligence of their fellow traveler in the common highway. But after a vessel is sunk, and left unmarked and unmanned, it ceases, in my

view, to be a "vessel" within the meaning of the limited liability acts. It is a trap, a nuisance; its victims have no chance for life and safety. I cannot believe that Congress ever intended to limit the doctrine of respondeat superior for the benefit of the owners of a nuisance in navigable waters.

Nor am I able to agree with my brethren in the interpretation put by them upon the statute of March 3, 1899, and the decisions made by other courts under that statute.

In the majority opinion it is stated as follows:

"The statute of 1899 is a criminal statute, and the failure of duty on the part of the owner of a vessel sunk in navigable waters there penalized is failure to mark the wreck after knowledge of the facts necessitating the performance of the duty; and the duty there imposed upon the owner as a basis for civil liability cannot be greater and will not arise until after knowledge that the vessel is a wreck. This is the construction placed upon the statute in The Fahy and other cases above cited. The act of 1899, therefore, is not, as has been suggested, in conflict with section 4283, but in harmony with its provisions, for the duty imposed on the owner is a personal one."

Apparently this means that the owner of a vessel negligently sunk or negligently left unmarked in navigable waters is not liable under the ordinary doctrine of respondeat superior for the negligent acts of his servants, but is only liable after the owner himself has knowledge of the situation.

Such has not been the interpretation put upon the act by other courts. In The Anna M. Fahy, 153 Fed. 866, 83 C. C. A. 48, the court said:

"The law places the duty of marking the wreck upon him [the owner] and he cannot escape responsibility by delegating it to others."

In The Macy, 170 Fed. 930, 96 C. C. A. 146, the court said:

"This statute was before us in The Anna M. Fahy, 153 Fed. 866, 83 C. C. A. 48, where it was held that the duty of marking the location of a wreck was placed by the statute on the owner, and no one else, and that there is no divided responsibility."

In Lehigh & Wilkesbarre Coal Co. v. Hartford & New York Transportation Co. (D. C.) 220 Fed. 348, 351, Mayer, District Judge, said:

"The importance of this legislation is obvious, and the tendency of the courts has been to hold owners strictly to the requirement of the statute."

While it may be true that in each of these cases the owner himself had knowledge or opportunity of knowledge of the wreck, yet the language used by the courts indicates their view that owners are responsible under the ordinary doctrine of respondeat superior for every act of negligence of their employés. To hold, as the majority apparently do in the above quotation, that this statute asserts failure of duty only "after knowledge of the facts necessitating the performance of duty" by the owner himself, is to extend the limited liability acts into the field of negligence in obstructing navigable waters. It reads into this statute of 1899 the "privity or knowledge" of the act of 1851. This amounts to saying that the owner of any vessel negligently sunk, or negligently left unmarked in a navigable channel, shall not be liable

for the acts of his agents in causing or maintaining such nuisance, unless the negligence was "with the knowledge or privity of the owner." I cannot agree with that interpretation of the statute.

As I have already indicated, even before the passage of the act of March 3, 1899, I do not think the limited liability acts had any application to the creation and maintenance of nuisances in navigable waters. So far as private liability is concerned, the act of March 3, 1899, seems to me but declaratory of previously existing maritime law. Compare The Caldy (D. C.) 123 Fed. 802, 804; The Plymouth, 225 Fed. 483, 140 C. C. A. 1.

That statute is a part of the Rivers and Harbors Act of the Fifty-Fifth Congress. See 30 Stat. c. 425, U. S. Comp. Sts. Ann. 1916, §§ 9918–9924. A large part of it is a compilation of police regulations concerning the improvement, maintenance, preservation, and protection of navigable waters and of property of the United States in and adjacent to such waters. As there is no common law of the United States prohibiting the obstruction of and creation of nuisances in navigable waters, such legislation was necessary in order to equip the national government with criminal penalties analogous to the power of indictment for public nuisances which the sovereign of England and the states have always exercised. Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8, 8 Sup. Ct. 811, 31 L. Ed. 629.

Clearly there is nothing in this legislation which can be fairly construed as cutting down previously existing civil liability for negligent obstruction of navigable waters. On the contrary, this act emphasizes the congressional purpose of holding all persons fully responsible, criminally as well as civilly, for such negligent obstruction.

Moreover, section 20 of the act expressly "repeals all laws or parts of laws inconsistent" therewith. There is no saving clause making the liability created or recognized by the act of 1899 subject to the limited liability acts, as there is in the Harter Act of February 13, 1893, c. 105, 27 Stat. 445, Comp. Sts. Ann. 1916, §§ 8029–8035.

If Congress had intended the owners of wrecks negligently caused or negligently left unmarked in navigable waters to have the benefit of the limited liability acts, cutting down the common-law liability arising under the doctrine of respondeat superior, we might fairly have expected the insertion of a saving clause to that effect, such as we find in the Harter Act.

I cannot, therefore, agree that the act of March 3, 1899, can be held merely a criminal statute. I think it clear that it ought not to be so narrowly limited, unless previous civil liability for negligent obstruction of navigable waters is held as broadly applicable as I have argued. Section 15 of the act of 1899 provides in express terms that—

"It shall not be lawful * * * to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels. * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful." 10 U. S. Comp. Sts. Ann. 1916, § 9920.

The opinion of the District Judge does not, it seems to me, warrant the interpretation put upon it by my brethren. That court did not hold the statute of 1899 applicable merely on the ground that "Williams was informed that the drillboat had sunk early enough so that, if he had sharply set about marking the wreck, he could have done so before the collision." The District Court held that the statute of 1899 created, or recognized, a civil liability for negligence in obstructing navigable channels enforceable against the owner under the ordinary principles of common law, including therein respondeat superior. I concur in that view.